UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DEBORAH DAVIS,<br>    Plaintiff, | :<br>:   CIVIL ACTION NO.<br>:   3:12-CV-01271 (JCH) |
| v. | :<br>:   SEPTEMBER 2, 2014 |
| TOWN OF BLOOMFIELD<br>    Defendant. | :<br>: |

**RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 41)**

**I.   INTRODUCTION**

Plaintiff Deborah Davis ("Davis") alleges that defendant, the Town of Bloomfield ("Bloomfield"), unlawfully terminated her employment because of her race, color, and sex, in violation of Title VII of the Civil Rights Act of 1964, as amended, and withdrew an offer of severance in retaliation for her filing a complaint charging discrimination, also in violation of Title VII.  Davis also alleges that Bloomfield breached her employment contract by terminating her employment without regard to Bloomfield's Personnel Rules and Regulations regarding layoffs of individuals with seniority.  Bloomfield has filed this Motion for Summary Judgment ("Def.'s Mot. for Summ. J.") (Doc. No. 41) in response.

For the reasons provided below, Bloomfield's Motion for Summary Judgment is **GRANTED**.

**II.   FACTUAL AND PROCEDURAL BACKGROUND**

A.   <u>Davis' Employment  by Bloomfield</u>

Davis is an African-American woman.  Defendant's Local Rule 56(a)1 Statement ("Def.'s L.R. 56(a)1 Stmt.") (Doc. Nos. 42, 43) at ¶ 30; Plaintiff's Local Rule 56(a)2 Statement ("Pl.'s L.R. 56(a)2 Stmt.") (Doc. No. 45-1) at § 1, ¶ 30.  She holds a bachelors degree from Boston College in political science and speech communications

1

and a Masters of Public Administration from the University of Southern California. Pl.'s L.R. 56(a)2 Stmt. at §2, ¶ 1. Bloomfield hired Davis as the Director of Economic Development on July 1, 2002. Def.'s L.R. 56(a)1 Stmt. at ¶ 1; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 1. During the hiring process, Davis was interviewed by Louie Chapman ("Chapman"), the Town Manager; Thomas Hooper ("Hooper"), the Town Planner; and Bainie Wild ("Wild"), the Assistant to the Town Manager; Chapman made the final decision to hire Bloomfield. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 2-6; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 2-6.

At the time of Davis' hire, Bloomfield did not have a Director of Economic Development or an Office of Economic Development ("OED"); the OED was resurrected with her hire. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 10, 12; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 10, 12. The OED consisted of two employees: the Director position, held by Davis, and a clerical position held by Keenyha Smith ("Smith"). Def.'s L.R. 56(a)1 Stmt. at ¶ 9; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 9. Throughout Davis' employment, the OED operated under the Town Planner and was part of Bloomfield's Planning and Zoning Department. Def.'s L.R. 56(a)1 Stmt. at ¶ 13; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 13.

### B. Hiring of Mace

In October 2008, Bloomfield commenced a hiring process to select an Assistant Director of Leisure Services to fill a vacancy in the Department of Leisure Services, to report to the Director of Leisure Services. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 14-15; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 14-15. Matthew Mace ("Mace"), a white male, was appointed to the position in March 11, 2009, to begin effective April 6, 2009. Def.'s L.R.

56(a)1 Stmt. at ¶ 17; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 17; Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 6.

### C. Davis' Layoff

As part of Bloomfield's budgetary process, Davis developed a budget for the OED which included the funding for her and her assistant's position for the 2009-2010 fiscal year. Def.'s L.R. 56(a)1 Stmt. at ¶ 18; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 18. Davis submitted the proposed budget to Hooper, who in turn submitted a proposed budget to Chapman that included the funding for the OED and Davis' position. Def.'s L.R. 56(a)1 Stmt. at ¶ 19; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 19. Chapman submitted the Bloomfield proposed budget for the fiscal year of 2009 to 2010 to the Town Council on March 17, 2009; the budget included fully funding the OED. Def.'s L.R. 56(a)1 Stmt. at ¶ 20; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 20.

During Bloomfield's ensuing budget hearings, the Town Council requested a wage freeze for the 2009-2010 fiscal year and discussed a reduction of the proposed budget, given the reducing revenues for the town due to a worsening economy. Def.'s L.R. 56(a)1 Stmt. at ¶ 22; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 22. In response, Chapman requested that Bloomfield's three unions forego their scheduled wage increases in exchange for a pledge from Bloomfield that there would be no personnel layoffs from their bargaining units for the 2009-2010 fiscal year. Def.'s L.R. 56(a)1 Stmt. at ¶ 23; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 23. The Town Council accepted and approved a budget incorporating these concessions. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 24-25; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 24-25.

Following the Town Council's approval of this budget, Chapman began issuing layoff notices to the three unions in case the unions refused the wage concession; even if the unions agreed to the concessions, however, further reductions were still necessary.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 26-27; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 26-27.  In considering what aspects of the town's operations that could be cut for further savings, Chapman testified that he considered areas of redundancy as well as areas which would have the least negative impact on direct services to the public, and that he ultimately decided to eliminate the two positions in the OED because doing so would have the least impact on direct services and the OED's functions could be returned to Hooper and the Town Manager's office, as they were handled prior to Davis' hiring.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 28-29; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 28-29.  Chapman testified that he made the decision to eliminate the OED positions.  Def.'s L.R. 56(a)1 Stmt. at ¶ 29.  Davis testified that Chapman said that "he and his staff" decided to eliminate her position.  Pl.'s L.R. 56(a)2 Stmt. at §2, ¶ 2.

Chapman issued layoff notices, effective June 30, 2009, to Davis and Smith, also an African-American woman, on May 7, 2009.  Def.'s L.R. 56(a)1 Stmt. at ¶ 30; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 30.  Davis reported receiving her layoff letter from Hooper on May 13, 2009; Davis testified that Hooper indicated that her position would be eliminated and told Davis that she could not do anything to stay on with Bloomfield.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 4.

Smith was able to fill a position in another department that was vacant due to the termination of an employee.  Def.'s L.R. 56(a)1 Stmt. at ¶ 34; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 34.  The elimination of Davis' and Smith's positions was projected to save

4

$128,808, plus all benefits associated with both positions.  Def.'s L.R. 56(a)1 Stmt. at ¶ 31; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 31.  However, Davis testified that, at the time of the elimination of her position, Mace was hired to work in the Leisure Services Department for $4,000 less than the salary that Davis had been earning.  Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 66; id. at § 2, ¶¶ 6, 15.

The Public Works and Police Department unions agreed to wage concessions; consequently, all layoff notices issued to those two union personnel were rescinded.  Def.'s L.R. 56(a)1 Stmt. at ¶ 32; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 32.  The third union, however, rejected the wage concessions, and a white male and African-American female were laid.  Def.'s L.R. 56(a)1 Stmt. at ¶ 33; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 33.  Another union member, a white male, resigned shortly after being notified that his position was being eliminated; had he not resigned, his layoff would have proceeded on June 30, 2009.  Id.  Davis was the only employee in a managerial position to be laid off.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 3.

      D.    <u>Severance Offer</u>

Upon receiving notification of her layoff, Davis requested that Chapman permit her to purchase additional years of service under Bloomfield's pension; Chapman denied her request.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 35-36; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 35-36.  Chapman testified that he rejected Davis' request because he had not permitted any employee outside of the Police Department union, which in 2002 negotiated the ability to purchase years of service for past service as a member of the Department and for past military service, to purchase additional years of service under

the pension for past service that was not performed on behalf of Bloomfield. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 37-38; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 37-38.

After Chapman informed Davis that he would not permit her to purchase additional years of service under the pension, Davis inquired about receiving severance. Def.'s L.R. 56(a)1 Stmt. at ¶ 39; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 39. Chapman directed Hopper and Wild to meet with Davis to offer her a severance agreement. Def.'s L.R. 56(a)1 Stmt. at ¶ 40; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 40. Wild emailed Davis to arrange a meeting to discuss her request for consideration concerning the closing of the OED, and informed Davis that any agreement needed to be reached quickly. Def.'s L.R. 56(a)1 Stmt. at ¶ 41; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 41. Wild and Hooper met with Davis on the following day, June 16, 2009, and offered her a severance agreement which included two-month's severance, continuance of Bloomfield's contribution to Davis' health insurance for two months, and pay for the remainder of June 2009. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 42-43; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 42-43. Davis testified that the severance offer was conditioned on her agreement to "sign something saying that [she] would not sue the town." Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 13. Davis requested time to respond to the severance offer; in response, Wild and Hooper informed her that they needed an answer within a couple of days because any severance agreement had to be finalized before the end of the fiscal year on June 30, 2009. Def.'s L.R. 56(a)1 Stmt. at ¶ 44; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 44.

The severance offer was terminated on June 18, 2009. Def.'s L.R. 56(a)1 Stmt. at ¶ 46; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 46. Chapman testified that he decided to withdraw the offer on June 18, 2009. Id. Chapman also decided to have Davis cease

work as of June 19, 2009, but compensate her for the remainder of June.  Id.  In keeping with Chapman's instruction, Wild drafted a letter on June 18, 2009, at 5:05 P.M., withdrawing the severance offer and informing Chapman that June 19, 2009 would be her last day to report to work and that she would be on paid leave through the end of June 2009.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 47-48; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 47-48.  Chapman signed the letter on June 19, 2009.  Def.'s L.R. 56(a)1 Stmt. at ¶ 50; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 49.

On June 18, 2009, at 6:45 P.M., Davis sent Chapman an email that included an attached complaint concerning an interaction Davis had had with Hooper on May 28, 2009, and a letter responding to the offer of two months' severance pay.  Def.'s L.R. 56(a)1 Stmt. at ¶ 50; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 50.  Chapman did not review the email from Davis until June 19, 2009.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 50-51; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 50-51.   In the attached complaint, Davis stated that she was filing a formal complaint against Hooper for "intentionally causing unnecessary infliction of pain and undue anguish" by accusing her of "lying about [her] time out loud in his office with over 5 to 7 people present," an incident that she reported made her feel discriminated against by Hooper as a woman and as an African-American.  Def.'s L.R. 56(a)1 Stmt. at ¶ 52; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 52.  Davis was the only African-American that reported to Hooper directly.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 17.

E.   Discrimination by Hooper against Davis

The incident described in the complaint attached to Davis' email to Chapman occurred on May 28, 2009, after Davis learned that Hooper had changed her vacation time, a change Davis believed was improper.  Def.'s L.R. 56(a)1 Stmt. at ¶¶ 53-54; Pl.'s

7

L.R. 56(a)2 Stmt. at § 1, ¶¶ 53-54. Davis went to Hooper's office to discuss the matter without arranging to do so beforehand. Def.'s L.R. 56(a)1 Stmt. at ¶ 55; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 55. Davis began to question Hooper regarding his recording of her time outside of Hooper's office; this part of the conversation, according to Davis, lasted for ten minutes. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 56-58, 60; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 56-58, 60. The conversation then moved into Hooper's office, where the door remained open; this part of the conversation lasted for another ten minutes. Def.'s L.R. 56(a)1 Stmt. at ¶ 58, 60; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 58, 60. During the conversation, Hooper told Davis that he would change the time if she had documentation to show that his changes to her vacation time were improper; Davis never provided this documentation. Def.'s L.R. 56(a)1 Stmt. at ¶¶ 61-62; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶¶ 61-62. In Davis' complaint, she reported that, during this discussion, she felt that Hooper had made a point of lashing out at her and humiliating her in front of a group of white people. Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 17. Davis testified that she complained to Chapman about this incident in person on the same day, and that Chapman "totally dismissed" her concerns. Id. at § 2, ¶ 18.

In addition, Davis testified that, throughout her employment with Bloomfield, Hooper consistently gave her salary increases that were a smaller percentage of her pay rate than those given to white employees under Hooper's supervision, and that this pay disparity existed from 2005 through 2009. Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶¶ 7, 10. Davis testified that she complained to Chapman "many times" about the pay disparity. Id. at §2, ¶ 12. She also testified that all of the white males who worked with Hooper received salaries that were higher than her salary, and that a white male who was laid

off effective June 30, 2009, and who had worked for Hooper directly, was brought back on three months later.  Id. at §2, ¶¶ 11, 14.

Davis reported that she told Chapman many times during her employment with Bloomfield that Hooper had issues with race.  Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 9.  Davis also testified that Chapman had stated that Hooper was "racially challenged" and had problems interacting with other races.  Pl.'s L.R. 56(a)2 Stmt. at §2, ¶ 8.

### F.     Post-Layoff

Following Davis' layoff, Hooper and Wild assumed the economic functions for Bloomfield.  Def.'s L.R. 56(a)1 Stmt. at ¶ 69; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 69.  Davis testified that the OED's duties were assumed by a "white female and two white males." Pl.'s L.R. 56(a)2 Stmt. at § 2, ¶ 5.  When Wild retired, she was replaced by Sharon Howe, an African-American female.  Def.'s L.R. 56(a)1 Stmt. at ¶ 70; Pl.'s L.R. 56(a)2 Stmt. at § 1, ¶ 70.  As of 2012, Hooper and Howe were still handling the economic development functions for the town.  Id.

## III.    STANDARD OF REVIEW

A motion for summary judgment is properly granted only if "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA, 642 F.3d 110, 116 (2d Cir.2011). Thus, the role of the district court in deciding a summary judgment motion "is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."  Id.  In making this determination, the court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  See Garcia v. Hartford Police Dep't, 706 F.3d 120, 127 (2d Cir.2013).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact." Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir.2010). Once the moving party has satisfied that burden, to defeat the motion "the party opposing summary judgment . . . must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" Wright v. Goord, 554 F.3d 255, 266 (2d Cir.2009) (quoting Fed. R. Civ. P. 56(e)). "For summary judgment purposes, a 'genuine issue' exists where the evidence is such that a reasonable jury could decide in the non-moving party's favor." Cambridge Realty Co., LLC v. St. Paul Fire & Marine Ins. Co., 421 F. App'x 52, 53 (2d Cir.2011); see also Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 104 (2d Cir.2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)) (stating that the non-moving party must point to more than a mere "scintilla" of evidence in its favor). "[U]nsupported allegations do not create a material issue of fact." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir.2000).

## IV.   DISCUSSION

Bloomfield seeks summary judgment on Davis' claims of sex and race discrimination and retaliation in violation of Title VII and of breach of contract. Def.'s Mot. for Summ. J. In opposing Bloomfield's Motion, Davis does not address whether a genuine issue of material fact exists as to her Title VII sex discrimination or breach of contract claims. Davis has thus abandoned these claims, and summary judgment is granted to Bloomfield on them. See Risica v. Dumas, 466 F. Supp. 2d 434, 438 (D. Conn. 2006) ("When a party fails to address one of the moving party's grounds for

summary judgment, the court may deem abandoned and grant summary judgment in favor of the moving party on that ground.").

     A.     <u>Title VII Claim of Race Discrimination</u>

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. Sec 2000e–2(a)(1).

To withstand a motion for summary judgment, a Title VII claim must survive the three-part burden-shifting test established by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>McDonnell</u>, 411 at 802, 805; <u>McPherson v. New York City Dept. of Educ</u>, 457 F.3d 211, 215 (2006). Under this test,

> [A] plaintiff first bears the "minimal" burden of setting out a <u>prima facie</u> discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a "legitimate, nondiscriminatory reason" for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

<u>McPherson</u>, 457 F.3d at 215.

     i.     <u>Prima Facie</u> Case

To establish a <u>prima facie</u> case of Title VII discrimination, Davis must show that 1) she was within a protected group, 2) she was qualified for the position, 3) she experienced adverse employment action, and 4) that action occurred under circumstances giving rise to an inference of discrimination. <u>Shumway v. United Parcel Serv. Inc.</u>, 118 F.3d 60, 63 (2d Cir. 1997).

Bloomfield argues that Davis cannot establish a <u>prima facie</u> case of Title VII race discrimination because she offers no evidence that her layoff occurred under

circumstances giving rise to an inference of racial discrimination. Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") (Doc. No. 41-1) at 16. Bloomfield also asserts that a number of undisputed facts run counter to any inference that Davis' layoff was driven by racially discriminatory motives, namely that Chapman, who made the decision to eliminate Davis' position was the same person who made the decision to hire Davis, and thus was aware of Davis' race in hiring her; that Chapman is also African-American; and that Chapman laid off both white and African-American employees when Davis was laid off. Id. at 17-18.

The evidentiary burden to establish a prima facie case is de minimis, however. McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001). That minimal burden is met by Davis' testimony that she was the only African-American to report to Hooper; that she was consistently paid less and given smaller pay raises than other white employees supervised by Hooper; that she was the only managerial-level employee to be laid off; and that her duties were taken over by employees outside of her protected class. See Zimmermann v. Associates First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the prima facie stage of the Title VII analysis . . . ."). Davis has thus proffered sufficient evidence to create a prima facie case of Title VII race discrimination.

  ii. Legitimate Nondiscriminatory Reason

Bloomfield's burden of production for rebutting Davis' prima facie case for discrimination is "not a demanding one," and requires only "an explanation for the employment decision," supported by evidence that, if true, would permit the conclusion

that the reason for the decision was non-discriminatory. Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999). Bloomfield contends that Davis was laid off because of budget constraints. Def.'s Mem. at 18-19. Bloomfield has submitted an affidavit from Chapman attesting to the Town Council's request for a wage freeze for the 2009-2010 fiscal year and budget cuts and Chapman's decision to lay off a number of employees, including Davis, to meet the reduced budget that the Town Council ultimately approved. Def.'s L.R. 56(a)1 Stmt. at Ex. C, ¶¶ 13-25. Courts have routinely recognized budgetary limitations as a legitimate non-discriminatory reason for an employer's decision to terminate an employee. See Turner v. NYU Hospitals Center, 470 Fed. Appx. 20, 22 (2d Cir. 2012) (recognizing budgetary reductions as legitimate nondiscriminatory justification for terminating employee). Thus, because Bloomfield has provided a non-discriminatory basis supported by evidence for its layoff of Davis, it has satisfied its burden here.

### iii. Pretext

Under the McDonnell Douglas framework, once the defendant has articulated a non-discriminatory basis for the adverse employment action, "the question in reviewing a motion for summary judgment becomes whether the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding" that the employment action was actually motivated by discrimination. Tori v. Marist College, 344 Fed. Appx. 697, 699 (2d Cir. 2009). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the [employment action]. . . . To get to the

13

jury, it is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination." Weinstock v. Columbia University, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks and citations omitted). It is permissible "for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000); see also Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 142 (2d Cir. 1993) ("[A] factfinder's disbelief of a defendant's proffered rationale may allow it to infer the ultimate fact of intentional discrimination in some cases.").

Davis argues that Bloomfield's assertion that Davis' position was eliminated due to budget constraints is pretextual because, she claims, at the same time her $68,000-per-year position was eliminated, a new position was created, paying $64,000-per-year, and was filed by a white male. Pl.'s Opp. at 11. This argument is unsupported by the evidence in the record, however. Bloomfield has proffered evidence that the hiring process for the position Davis asserts was created at the same time her position was eliminated actually began in October 2008, more than six months before the Town Council approved a constrained budget and Davis was laid off. Def.'s L.R. 56(a)1 Stmt. at Ex. F. Davis does not dispute that Mace, the white male hired to this position, was hired in March 2009, also months before the budget reduction and Davis' termination. Thus, the record does not support the temporal connection that Davis attempts to establish between the elimination of her position and the creation of a new position given to a white male that paid close to the same amount as her position. Davis' and Mace's positions were also, notably, significantly dissimilar: it is undisputed that the

14

positions were in two entirely different departments, and Bloomfield has provided evidence that each position required different qualifications and involved different duties. Def.'s L.R. 56(a)1 Stmt. at Exs. E, G. Bloomfield's given reason of budget cuts for terminating Davis, then, cannot be undermined by its hiring of Mace.

Davis' assertion that Bloomfield's given basis for her termination was pretextual is further undone by the fact that the person alleged to have had a discriminatory animus against Davis—Hooper—was not responsible for the elimination of her position. Davis has proffered nothing to dispute that Chapman made the final decision to terminate her, other than her testimony that Chapman told her that "he and his staff decided" to eliminate her position. Deposition of Deborah Davis (Doc. No. 45-2) at 36:17-19. Nor has Davis provided any testimony or evidence that suggests that Hooper had any influence over Chapman's decision. See Bickerstaff, 196 F.3d at 450 (recognizing that "impermissible bias" of non-decisionmaker may taint an employment decision in violation of Title VII if that non-decisionmaker is shown to have played a "meaningful role" in the employment decision). Davis' repeated complaints to Chapman that Hooper had issues with race and that she was being paid less than other white employees supervised by Hooper is not sufficient to create a genuine issue of disputed fact as to whether Hooper and his racial bias "played a meaningful role" in Chapman's decision to eliminate Davis' position.

Davis has failed to provide any evidence upon which a reasonable jury could find that Bloomfield's justification for her termination pretextual, and thus cannot defeat summary judgment on her Title VII race discrimination claim. Summary judgment is granted to Bloomfield on this claim.

B.  Title VII Claim of Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [an employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.2000e–3(a).

Like substantive Title VII discrimination claims, a claim of retaliation in violation of Title VII must survive the McDonnell-Douglas burden-shifting framework. Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001). Additionally, a plaintiff claiming retaliation "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." University of Texas Southwestern Medical Center v. Nassar, 133 S.Ct. 2517, 2534 (2013).

To establish a prima facie case of retaliation, a plaintiff must show that "(1) she was engaged in an activity protected under Title VII; (2) the employer was aware of plaintiff's participation in the protected activity; (3) the employer took adverse action against plaintiff; and (4) a causal connection existed between the plaintiff's protected activity and the adverse action taken by the employer." Raniola, 243 F.3d at 624.

Davis cannot establish a prima facie case of retaliation because she cannot establish a causal connection between her engagement in protected activity—i.e., her filing of a formal complaint of discrimination on June 18, 2009—and Chapman's decision to retract Bloomfield's severance offer. Davis does not dispute Chapman's testimony that he decided to withdraw the severance offer on June 18, 2009. It is also undisputed that Chapman directed Wild to draft the letter withdrawing the offer on June

16

18, 2009; Bloomfield has submitted evidence, unrebutted by Davis, that Wild began to draft the letter at 5:05 P.M. on June 18. See Def.'s L.R. 56(a)1 Stmt. at Ex. J. The record reflects that Davis emailed her formal complaint to Chapman at 6:45 P.M. on June 18. Id. at Ex. L. While Davis is correct to observe that "'[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by adverse action,'" Pl.'s Opp. at 7 (quoting Cifra v. General Electric Co., 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation marks omitted)), that a Title VII plaintiff may prove retaliation indirectly is of no assistance to her retaliation claim. The undisputed facts make clear that the withdrawal of the severance offer preceded her engagement in protected activity. See supra Part II.D at 6-7. Hence, no genuine issue of material fact exists as to whether Bloomfield retaliated against Davis because she filed a formal discrimination complaint. Summary judgment must be granted on this claim to Bloomfield.

## IV.   CONCLUSION

Given that no genuine issues of material fact exist as to Davis' claims against Bloomfield, Bloomfield's Motion for Summary Judgment (Doc. No. 41) is **GRANTED**. **SO ORDERED.**

Dated at New Haven, Connecticut this 2nd day of September, 2014.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge